UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MELANIE SENTIN,

Plaintiff,

v.

KIMBERLY SZCZEPANKIEWICZ ET AL.,

Defendants.

23-CV-108-LJV
DECISION & ORDER

On February 1, 2023, Melanie Sentin, then proceeding pro se, commenced this action under 42 U.S.C. § 1983, alleging violations of her constitutional rights in connection with a series of events related to the custody of her children.[1] Docket Item 1. She asserted claims against four defendants: Kimberly Szczepankiewicz and Corey Cobb, both employees of Erie County Child Protective Services; and Gary Mahoney and John Doe, both New York State Police Officers. *Id.*

After Cobb, Szczepankiewicz, and Mahoney moved to dismiss the complaint, Docket Items 7, 8, and 24, this Court issued a decision and order denying Mahoney's motion but granting the motions by Cobb and Szczepankiewicz. Docket Item 24; *see also Sentin v. Szczepankiewicz*, 2023 WL 7701811 (W.D.N.Y. Nov. 15, 2023). In light of Sentin's pro se status, however, the Court allowed her to amend the complaint to state claims against Cobb and Szczepankiewicz. *Id.*

[1] Although Sentin did not explicitly invoke section 1983 in her original complaint, the Court construed the complaint as raising such claims because Sentin sued several state and county officials for the violation of her constitutional rights. *See Sentin v. Szczepankiewicz*, 2025 WL 872175, at *1 n.1 (W.D.N.Y. Mar. 20, 2025).

On December 27, 2023, Sentin filed her first amended complaint. Docket Item 25. After Mahoney answered the amended complaint, Docket Item 26, this Court referred the case to United States Magistrate Judge Leslie G. Foschio for discovery and other pretrial proceedings. Docket Item 27. Cobb and Szczepankiewicz then moved to dismiss the amended complaint for failure to state a claim. Docket Item 37. This Court granted their motions but gave Sentin one more chance to amend. Docket Item 48.

On March 28, 2025, Judge Foschio appointed pro bono counsel to represent Sentin, Docket Items 49 and 50, and about two months later, Sentin filed a second amended complaint through her newly appointed counsel, Docket Item 53. In addition to naming Szczepankiewicz and Mahoney as defendants, the second amended complaint named Malcolm Cully, an investigator with the New York State Police whom Sentin identified as the John Doe defendant she had sued initially. *Id.* The second amended complaint did not name Cobb.

After Szczepankiewicz moved to dismiss the second amended complaint, Docket Item 57, Sentin moved for leave to file a third amended complaint. Docket Item 64. On January 14, 2026, "[g]iven th[e] lack of opposition and the limited time Sentin's pro bono counsel had to prepare the second amended complaint," this Court granted Sentin's motion for leave to amend. Docket Item 71. In doing so, the Court allowed Szczepankiewicz to "incorporate by reference any prior filings and arguments" in a future motion to dismiss. *Id.*

On that same day, Sentin filed her third amended complaint, raising claims under 42 U.S.C. § 1983 and New York Family Court Act § 1024. Docket Item 72. Mahoney and Cully both answered that complaint, Docket Item 75, but Szczepankiewicz again

moved to dismiss, incorporating by reference the arguments in her prior motion and raising new arguments as well, Docket Item 73. Sentin responded to that motion, Docket Item 76; Szczepankiewicz did not reply, and the deadline to do so has passed. *See* Loc. R. Civ. P. 7(b)(2)(B).

For the reasons that follow, the Court grants in part and denies in part Szczepankiewicz's motion to dismiss.

## BACKGROUND[2]

Sentin "was born in the Philippines[] and . . . became a U[nited] S[tates] citizen in February 2014." Docket Item 72 ¶ 7. Her native language is Tagalog, and while "she is capable of communicating conversationally in English," she is "not sufficiently fluent in English to understand legal documents or court proceedings." *Id.* ¶¶ 9-10.

Sentin is the mother of two children, G.H. and M.S., both minors when she commenced this action. *Id.* ¶ 8; *see also* Docket Item 1. From about 2012 until the events giving rise to this case began, Sentin and her children lived in Eden, New York, with Sentin's partner, "Daniel K." Docket Item 72 ¶¶ 14-15.

On February 4, 2022, Sentin was working as a Certified Nursing Assistant at a private home in Hamburg, New York*, id.* ¶¶ 16-17, while her children were alone at home in Eden on winter break. *Id.* ¶¶ 21, 51. At around 10:20 a.m., G.H. called Sentin at work. *Id.* ¶¶ 17-18. G.H. "sounded very frightened" and said that "there were two

---

[2] The following facts are taken from the third amended complaint. Docket Item 72. On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). Throughout this decision, page numbers in docket citations refer to ECF pagination.

policemen knocking on the door and looking for" Sentin. *Id.* ¶¶ 19-20. G.H. handed the phone to one of the police officers—defendant Mahoney—who told Sentin "that he was a police investigator and wanted to talk to her in person." *Id.* ¶¶ 22-24. Sentin told Mahoney that she was at work, but "Mahoney insisted that he needed to speak to [her] immediately" on a matter involving her daughter. *Id.* ¶¶ 25-27. Mahoney "demanded" that Sentin provide the address where she was working, and Sentin complied. *Id.* ¶¶ 27-28.

At around 11:15 a.m., defendants Mahoney and Cully "arrived at [] Sentin's work site[] and spoke to her outside the house." *Id.* ¶ 29. Mahoney told Sentin that they were investigating Daniel K for "potential sex abuse" involving M.S. *Id.* ¶ 30. Mahoney and Cully "ordered [] Sentin to return to her home in Eden[] and to bring her children to downtown Buffalo." *Id.* ¶ 32. Sentin was "very upset" and "initially refused to comply," but "Mahoney and Cully forced her to leave her elderly patient alone and unsupervised, half-dressed, and without breakfast." *Id.* ¶¶ 31, 33. "Sentin was frightened and crying[] but did not think she had any right to refuse [the d]efendants' orders," so she returned to her home in Eden followed by Mahoney and Cully. *Id.* ¶¶ 34-36.

When Sentin arrived at her house, "Mahoney and Cully followed her into the garage." *Id.* ¶ 38. "Mahoney and Cully knew that Daniel K was not present in the home when they returned to the home with [] Sentin." *Id.* ¶ 39. Mahoney told Sentin "that the police were in possession of a video that showed inappropriate sexual behavior between Daniel K" and Sentin's daughter, M.S., and that Daniel K had "sexually abus[ed]" M.S. *Id.* ¶¶ 40-41.

Sentin then told Mahoney and Cully to leave. *Id.* ¶ 42. They did not leave, however, and when Sentin opened the door to her house, "Mahoney and Cully quickly pushed past her and entered the house" without her permission. *Id.* ¶¶ 43-46. "Mahoney and Cully did not have a search warrant to enter the house," nor did they "have probable cause to believe that a crime was being committed inside the house" or that the children "were in imminent danger." *Id.* ¶¶ 47-50.

Mahoney "began taking photographs inside the house" without Sentin's permission. *Id.* ¶¶ 54-55. Mahoney and Cully opened drawers, "unplugged the telephone, disconnected the internet, and unplugged the television without permission." *Id.* ¶¶ 56-57. Mahoney told Sentin to "get her children ready to go to Buffalo." *Id.* ¶ 58.

M.S. told Sentin "she was very scared and did not want to go with [the d]efendants." *Id.* ¶¶ 60-61. When Sentin told Mahoney and Cully that M.S. "did not want to go with them," they "went upstairs and entered [M.S.'s] room unannounced" while "she was in the middle of changing her clothes." *Id.* ¶¶ 62-64. Mahoney and Cully then "returned to the first floor of the house and demanded" that Sentin drive her children to the Child Advocacy Center on Franklin Street in Buffalo. *Id.* ¶ 65. They did not give Sentin time even to "feed the children lunch[ or] get them into proper clothing for the weather." *Id.* ¶ 66.

While all this was happening, neither Mahoney nor Cully offered Sentin an interpreter. *Id.* ¶ 68. Sentin did not ask for an interpreter "because she was frightened and confused[] and because she did not know she had the right to request an interpreter." *Id.* ¶ 69.

A short time later, Sentin, her children, Mahoney, and Cully, arrived at the Child Advocacy Center. *Id.* ¶ 70. Sentin and her children were "interviewed separately in [] different room[s]"; they "were not free to leave"; and they "felt that they were being forced to speak." *Id.* ¶¶ 71-72, 78-79.

Sentin "did not understand what was happening" and "was not provided with an interpreter." *Id.* ¶¶ 73, 75. At one point, Sentin "was asked to complete a form which she did not understand." *Id.* ¶ 74. An employee "at the Child Advocacy Center filled out the form and directed [] Sentin to sign it." *Id.* ¶ 76. Mahoney "demanded" that Sentin call Daniel K to say that M.S. "came to [her] crying[] and said she was sexually abused." *Id.* ¶¶ 80-82. When Sentin told Mahoney "that had never happened," Mahoney was "very demeaning to [] Sentin." *Id.* ¶¶ 83-84.

"Sentin and her children remained in the custody of [] Mahoney and Cully at the Child Advocacy Center for approximately five hours." *Id.* ¶ 86. "Mahoney and Cully treated [] Sentin with hostility and suspicion, as if she w[ere] a criminal," which caused her "extreme emotional distress." *Id.* ¶ 87. Sentin believes such "hostile treatment . . . was based upon [Mahoney and Cully]'s intent to discriminate against [her] on the basis of [her] Asian race." *Id.* ¶ 88.

After Sentin's children told her that they wanted to go home, Sentin "asked if she could take her children home." *Id.* ¶¶ 89-92. In response, the employees at the Child Advocacy Center "asked if there was somewhere [she] could take her children other than their home." *Id.* ¶ 93. Sentin told them that her parents lived in Silver Creek, New York. *Id.*

Sentin does not recall anyone from the Child Advocacy Center telling her that she should not take the children home, and she was not provided with any written instructions*, id.* ¶¶ 94-96, so Sentin took her children to their home in Eden*, id.* ¶ 98. On the drive home, Sentin's children told her that "none of the allegations of sexual abuse were true." *Id.* ¶ 97. The children remained at home in Eden through that weekend. *Id.* ¶ 99. Sentin and her children did not tell Daniel K about the events of February 4, 2022. *Id.* ¶¶ 100-01.

The following Monday, February 7, 2022, defendant Szczepankiewicz called Sentin at work and "demanded that [] Sentin leave her worksite and meet with [] Szczepankiewicz at the Erie County Department of Social Services offices in Cheektowaga." *Id.* ¶ 102. Sentin asked for an interpreter but Szczepankiewicz denied the request. *Id.* ¶¶ 103-04. Nevertheless, Sentin did as she was told and met with Szczepankiewicz without an interpreter. *Id.* ¶¶ 105-06.

Sentin told Szczepankiewicz about the events that occurred on February 4—namely, that "Mahoney and Cully had forced their way into her house, searched drawers, photographed the interior of the house, and unhooked the internet and television without permission and without any paperwork"—but "Szczepankiewicz ignored [] Sentin's complaints." *Id.* ¶¶ 107-08. Sentin told Szczepankiewicz that she had "a very good relationship with her children[,] that her children . . . told her no sexual abuse had occurred, and that she believed" them. *Id.* ¶ 109. But Szczepankiewicz "yelled at [] Sentin," told her that M.S. "was a liar," and said that "she would take [] Sentin to [c]ourt." *Id.* ¶ 110. Szczepankiewicz was "very rude" to Sentin and treated her

"like a criminal"; Sentin believes that "Szczepankiewicz's hostility was based on" the fact that Sentin is Asian. *Id.* ¶¶ 111-12.

Szczepankiewicz then told Sentin "that the children would not be permitted to return to their home in Eden" and "would have to stay with [] Sentin's parents." *Id.* ¶¶ 113-14. Szczepankiewicz did not tell Sentin that she had the "right to petition Family Court for the return of her children" or that she had the "right to be represented by counsel in a Family Court proceeding." *Id.* ¶¶ 115-16. "Sentin complied with [] Szczepankiewicz's orders and arranged for her parents to pick up [her children] from school and bring [them] to their home in Silver Creek." *Id.* ¶ 117.

Szczepankiewicz also told Sentin that she "was not permitted to see her children." *Id.* ¶ 118. Because Sentin was "frightened and confused," she "did not attempt to see her children" that day; in fact, the children moved in with Sentin's parents and did not return home. *Id.* ¶¶ 120-21. Szczepankiewicz "did not make a report to the Family Court concerning the removal of the children from [] Sentin's custody on February 7, 2022." *Id.* ¶ 119.

On February 8, 2022, Sentin and Szczepankiewicz met at Sentin's parents' home. *Id.* ¶ 122. Sentin's parents are "less fluent in English" than she is, but Szczepankiewicz still "did not offer" an interpreter. *Id.* ¶¶ 123-24. At the meeting, Szczepankiewicz "demanded [that ] Sentin and her parents 'acknowledge' that Daniel K had abused" M.S. *Id.* ¶ 127. But Sentin and her parents would not acknowledge that because M.S. "denied the allegations." *Id.* ¶ 128. Szczepankiewicz "did not inspect the grandparents' home to ensure it was suitable" for the children; "[i]nstead, [she] spent the visit talking badly about Daniel K." *Id.* ¶¶ 125-26.

Following the February 8 meeting, Sentin "visited frequently with her children at the home of the maternal grandparents, including spending some nights there." *Id.* ¶ 129. And "[d]espite [] Sentin's confusion and fear, she immediately took steps to ensure that her children would never be exposed to Daniel K again." *Id.* ¶ 130. More specifically, Sentin "ended her relationship with Daniel K," did not allow Daniel K to see her children, and "immediately began searching for an apartment of her own." *Id.* ¶¶ 131-33. Sentin asked Szczepankiewicz to help her find "a suitable apartment for herself and her children," but Szczepankiewicz did not provide any assistance. *Id.* ¶¶ 134-35.

On several occasions between February 7, 2022, and February 24, 2022, Szczepankiewicz called Sentin and "demanded that [she] surrender all of [her] legal documents relating to her" citizenship status. *Id.* ¶ 149. Sentin "did not understand why she was required to turn over the documents, and [she] refused to do so." *Id.* ¶ 150.

Szczepankiewicz then "filed an abuse petition" against Sentin in Family Court on February 24, 2022. *Id.* ¶¶ 145, 151. The petition alleged that Daniel K "abused and/or severely abused" both children "by sexually assaulting M[.]S[.] on several occasions" and that Sentin had "abused and/or severely abused" her children "by virtue of Daniel K's alleged sexual assaults" and by "return[ing] to the home with the children after the [Child Advocacy Center] interview on February 4." *Id.* ¶ 167. The petition also falsely suggested that "Sentin had refused to remove her children from Daniel K's house despite having been directed to do so." *Id.* ¶ 147. And the petition "argued that G[.]H[.] was at risk of abuse" even though "there was no evidence whatsoever that G[.]H[.] had been abused or had witnessed abuse." *Id.* ¶ 148.

After February 7, 2022, Sentin "had severed relations with Daniel K and ensured that he never had contact with the children." *Id.* ¶ 159. Despite this, "Szczepankiewicz persisted in prosecuting the abuse petition" and "advocating to keep the children out of [] Sentin's custody." *Id.* ¶¶ 159-61. Sentin believes that Szczepankiewicz's "failure to assist [her] in regaining custody of her children was based upon" Sentin's Asian race. *Id.* ¶ 146.

Szczepankiewicz called Sentin and told her to be in court on February 24, 2022. *Id.* ¶ 152. Sentin asked Szczepankiewicz for an interpreter, but Szczepankiewicz said that Sentin "did not need an interpreter." *Id.* ¶¶ 153-54. Szczepankiewicz did not tell Sentin that she had the "right to apply to Family Court for an interpreter."[3] *Id.* ¶ 155. Sentin "did not understand what was happening" during the Family Court proceedings on February 24, 2022*, id.* ¶ 157, other than that Szczepankiewicz "angrily berated" Sentin each time Sentin "failed to cooperate with [] Szczepankiewicz's demands," *id.* ¶ 158.

As a result of these proceedings, the Family Court "issued [o]rders for the [t]emporary [r]emoval" of M.S. and G.H. from Sentin's custody but allowing them to live with Sentin's parents. *Id.* ¶ 168. The order gave Sentin "only agency-supervised access to her children." *Id.* Sentin says that this order was based upon the "false and misleading allegations contained in the [p]etition." *Id.* ¶ 169.

[3] Sentin believes that "Szczepankiewicz's refusal to inform [her] of the procedure for obtaining an interpreter at the initial court appearance and at the prior meetings was based upon [] Szczepankiewicz's intent to discriminate against [her] on the basis of [] Sentin's Asian race." *Id.* ¶ 156.

In March or April 2022, Sentin moved into her own apartment in Hamburg, New York. *Id.* ¶ 136. After Sentin moved out of the home she shared with Daniel K, "there was no risk of further harm to the children if they were to be returned to" Sentin's custody. *Id.* ¶ 137. But "[i]nstead of working to restore custody of the children" to Sentin, Szczepankiewicz "continued to pursue legal efforts to remove both of the children" from Sentin's custody and "terminate . . . [her] parental rights." *Id.* ¶ 138. Szczepankiewicz also "continued to demand that [] Sentin sign a document 'acknowledging' that Daniel K had sexually abused" M.S. *Id.* ¶ 139. But M.S. "insisted . . . that the allegations of abuse were not true," so Sentin "could not sign the 'acknowledgment' without betraying her daughter's trust." *Id.* ¶¶ 140-41. Nevertheless, Szczepankiewicz "refused to consider" Sentin's reason for not signing the acknowledgment, and Sentin believes that is so because Sentin is Asian. *Id.* ¶¶ 142-43.

On October 17, 2022, the Family Court issued an order removing M.S. and G.H. from their grandparents' custody and placing them in "foster care in the custody of the Erie County Department of Social Services." *Id.* ¶ 170. Family Court then "conducted hearings, and . . . issued a [d]ecision holding that Daniel K had abused M[.]S[.]; that [] Sentin knew or should have known what Daniel K was doing to M[.]S[.], but allowed the abuse to continue; and that G[.]H[.] was a derivatively abused child because he was present in the home when the abuse of M[.]S[.] occurred."[4] *Id.* ¶ 171.

[4] Even after M.S. became an adult, Szczepankiewicz "continued to oppose [] Sentin's efforts to secure the return" of G.H. to Sentin's custody, *id.* ¶ 163. In fact, since February 2022 Szczepankiewicz has treated Sentin "with hostility and suspicion," which has caused Sentin "extreme emotional distress." *Id.* ¶ 164. Sentin believes such treatment was based upon her Asian race. *Id.* ¶ 165.

The allegations against Daniel K were based on "video evidence obtained by the FBI during an investigation into the activities of a convicted child pornographer . . . who notified the FBI that . . . [he] had allegedly hacked [into the] internet cameras in Daniel K's home" and found videos "that appeared to show Daniel K sexually assaulting" M.S. *Id.* ¶ 172(d). But the videos were "dated approximately two years before the events at issue" in this case, *id.*; M.S. consistently denied that Daniel K ever abused her*, id.* ¶ 172(a); and both Sentin and G.H. said that they were unaware of any abuse*, id.* ¶ 172(b)-(c). What is more, "[t]here was no evidence before the Family Court that [] Sentin actually knew of the abuse." *Id.* ¶ 172(f).

Sentin and Daniel K each filed separate appeals from the Family Court's decision. *Id.* ¶ 173. "Two separate panel[s] of the Appellate Division, Fourth Department[,] heard the appeals" and affirmed the Family Court's decision*, id.* ¶¶ 174-75, but the New York Court of Appeals granted leave to appeal, *id.* ¶ 178; *see Matter of M.S.*, 42 N.Y.3d 1069, 251 N.E.3d 641 (2025). And on February 17, 2026, the Court of Appeals found that that the evidentiary "foundation offered for the videos was insufficient," reversed the decision of the Appellate Division, and dismissed the petition. Docket Item 77-1 (Court of Appeals decision); *see Matter of M.S.*, 2026 WL 436359 (N.Y. 2026).

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## **DISCUSSION**

### I. SECTION 1983

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). To establish liability against a government official under section 1983, a plaintiff must plead that the "[g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o [s]tate shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It is well settled in the Second Circuit "that a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103 (2d

Cir. 1999) (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992)); *see also Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) ("Parents . . . have a constitutionally protected liberty interest in the care, custody[,] and management of their children."). Parents' rights in this context are both substantive and procedural. *See Hagans v. Nassau Cnty. Dep't of Soc. Servs.*, 2020 WL 1550577, at *5 (E.D.N.Y. Mar. 31, 2020); *see also Albright v. Oliver*, 510 U.S. 266, 272 (1994) (the Due Process Clause "confers both substantive and procedural rights"). A "procedural due process claim challenges the procedure by which a removal [of parental rights] is effected, [while] a substantive due process claim challenges the 'fact of [the] removal' itself." *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (quoting *Bruker v. City of New York*, 92 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2000)).

Sentin says that Szczepankiewicz violated both her procedural and substantive due process rights. Docket Item 72 ¶¶ 207, 209. More specifically, Sentin says that her procedural due process rights were violated when Szczepankiewicz removed Sentin's children from her custody without affording her any "procedural due process protections" such as an interpreter or a lawyer. *Id.* ¶ 207. And Sentin says that taking her children away from her violated her right to substantive due process as well. *Id.* ¶ 209.

Szczepankiewicz first challenges whether Sentin suffered any deprivation in the first place. In other words, Szczepankiewicz argues that Sentin "failed to show that the children were removed from her custody" before the Family Court order on February 24, 2022. Docket Item 73-2 at 5. And it is true that Sentin does not explicitly state that Szczepankiewicz removed her children from her custody.

But Sentin says that Szczepankiewicz told her that the children "would have to stay with []Sentin's parents" and that Sentin "arranged for her parents to pick [the children] up from school and bring the children to their home." Docket Item 72 ¶¶ 114, 117. Sentin says that Szczepankiewicz told her that she was not permitted to see her children, something Sentin understood to mean that she had to give up custody of her children and could no longer live with them. *Id.* ¶¶ 113-18. While Sentin would visit "her children at the home of the[ir] maternal grandparents, including spending some nights there," they did not live with Sentin. *Id.* ¶ 129; *see id.* ¶ 121.

At this stage, these allegations are sufficient to suggest that Szczepankiewicz removed Sentin's children from Sentin's custody—at least temporarily. Sentin alleges that as an employee of the Erie County Department of Social Services—and, in particular, Child Protective Services—Szczepankiewicz told Sentin that Sentin's children could not return home with her and had to stay with their grandparents. *Id.* ¶ 114. And believing that she had to comply with that direction, Sentin arranged for the children to reside with her parents. *Id.* ¶ 117. At this stage of the proceedings, that is sufficient to allege a significant deprivation of Sentin's parental rights. *See Stumpf v. Cooley*, 2024 WL 1443647 at *3 (W.D.N.Y. Apr. 3, 2024) (finding a defendant caused a deprivation where the parent was "forced" to "voluntar[ily] turn over" their children).

### A. Procedural Due Process

Sentin says that her procedural due process rights were violated when Szczepankiewicz removed the children from her custody without affording her the "procedural due process protections" of an interpreter or lawyer. Docket Item 72 ¶ 207. In support of her argument, Sentin cites a New York regulation requiring "the

appointment of an interpreter in cases involving 'an interested parent or guardian of a minor party in a Family Court proceeding, [who] is unable to understand and communicate in English to the extent that he or she cannot meaningfully participate in the court proceedings.'" Docket Item 76 at 15 (alteration in original) (quoting N.Y. Comp. Codes R. & Regs. tit. 22, § 217.1 (2016)). But that regulation requires an interpreter in court proceedings, not at meetings with Child Protective Services. N.Y. Comp. Codes R. & Regs. tit. 22, § 217.1. And that regulation places the responsibility to appoint an interpreter only on the court. *Id.*

The more concerning issue with respect to procedural due process is that Sentin's children were taken from her before the issuance of a court order. Docket Item 72 ¶¶ 208-10. "As a general rule . . . before parents may be deprived of the care, custody[,] or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Tenenbaum*, 193 F.3d at 593. And when children are removed from a parent's custody without a court order, "the critical question . . . is 'whether there [was] time to obtain a court order' beforehand." *K.W. v. City of New York*, 177 F.4th 127, 142 (2d Cir. 2026) (alteration in original) (quoting *Tenenbaum*, 193 F.3d at 594-95). "If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, ex parte or otherwise, for the child's removal, then the circumstances are not emergent [and] there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody[,] and management of their child." *Tenenbaum*, 193 F.3d at 594.

It is not clear whether M.S. and G.H. were taken from Sentin's custody pursuant to an emergency removal. And even if they were, there is no indication that Szczepankiewicz, or anyone at Erie County Child Protective Services, found that M.S. and G.H. were in such imminent danger that they required an emergency removal. Docket Item 72 ¶ 211. Indeed, after telling Sentin that the children could not return home after February 7, 2022, Szczepankiewicz did not report such removal to the Family Court until she filed the abuse petitions more than two weeks later. *Id.* ¶¶ 119, 151. At this early stage of the litigation, the allegations are sufficient to raise a plausible procedural due process claim.

**B. Substantive Due Process**

Substantive due process protects the rights of parents "to remain together with their children without the coercive interference of the awesome power of the state.'" *Southerland*, 680 F.3d at 142 (quoting *Tenenbaum*, 193 F.3d at 600). But as sweeping as such language might sound, it is far from absolute. *See Wilkinson*, 182 F.3d at 104 ("Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" (quoting *Manzano v. S.D. Dep't of Social Servs.*, 60 F.3d 505, 510 (8th Cir.1995)). Indeed, to constitute a substantive due process violation, "[t]he interference with" parents' custody of their child "must be 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Southerland*, 680 F.3d at 143 (quoting *Anthony v. City of New York*, 339 F.3d 129, 143 (2d Cir. 2003)). Stated

another way, to state a viable substantive due process claim, "[i]t is not enough that the government act be incorrect or ill-advised; it must be conscience-shocking." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (internal quotation marks omitted).

The Second Circuit "has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of [child] abuse." *Wilkinson*, 182 F.3d at 104. Along those lines, "brief removals [of a child from a parent's home] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." *Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003) (citing *Tenenbaum*, 193 F.3d at 600-01 & n.12). And once such "court confirmation of the basis for removal" is obtained, any further separation cannot be "attributed to the officer who removed the child." *Southerland*, 680 F.3d at 153.

The removal Szczepankiewicz initiated was largely based on video evidence of sexual abuse alleged to have occurred in Sentin's home. Docket Item 72 ¶¶ 40, 172. But the New York Court of Appeals later found that the evidence lacked a sufficient basis: the court took issue with the two-and-a-half-year gap in the chain of custody and lack of proper authentication of the video. Docket Item 77-1 at 11, 14-15; *Matter of M.S.*, 2026 WL 436359, at *5-6 ("The failure to authenticate evidence sufficiently does not mean the evidence was false, but only that it was not properly authenticated according to the rules of evidence. . . . We do not mean to suggest that the videos here

could not have been authenticated, . . . [b]ut the evidence of authentication proffered here was legally insufficient.").

It is unclear from the pleadings exactly what Szczepankiewicz knew about the origin, chain of custody, or authentication issues when she initiated the removal proceedings. And it may well be that Szczepankiewicz acted reasonably—and in a matter that was not "conscience-shocking" or "egregious"—based on what she knew of the videos at the time. But Sentin suggests that Szczepankiewicz prepared the Family Court abuse petition and worked to "remove [] Sentin's children from her custody" based on what Szczepankiewicz knew was "falsified" and "unfounded." *See* Docket Item 72 ¶ 211. She therefore has plausibly alleged the sort of conduct that rises to a substantive due process violation.

Sentin also alleges that Szczepankiewicz treated her unfairly, and pursued the removal of her children, because of Sentin's ethnicity. *Id.* ¶ 214. Sentin's allegations on this point are sparse: she says only that she is Asian and that Szczepankiewicz asked for her citizenship papers, would not provide an interpreter, and failed to assist her in finding a new home. *Id.* ¶¶ 149, 153-56, 165; Docket Item 76 at 16. Sentin concludes that Szczepankiewicz was "hostile," was "very rude," and "treated [her] like a criminal" because Sentin is Asian. *See* Docket Item 72 ¶¶ 111-12. Whether such allegations are sufficient is a close call, but the Court finds at this stage that they are.

## II. N.Y. FAMILY COURT ACT § 1024

Sentin's second cause of action against Szczepankiewicz alleges violations of New York Family Court Act § 1024, which outlines the procedure for the emergency

removal of a child without a court order. *See* Docket Item 72 at ¶¶ 216-33; N.Y. Fam. Ct. Act § 1024. In relevant part, section 1024 provides that:

> [A] designated employee of a city or county department of social services shall take all necessary measures to protect a child's life or health including, when appropriate, taking or keeping a child in protective custody . . . [if] such person has reasonable cause to believe that the child is in such circumstance or condition that his or her continuing . . . in the care and custody of the parent . . . presents an imminent danger to the child's life or health.

N.Y. Fam. Ct. Act § 1024(a). And if the designated employee "keeps custody of a child," she must (1) "bring the child immediately to a place approved for such purpose by the local social services department"; (2) "make every reasonable effort to inform the parent"; and (3) "give . . . written notice to the parent . . . of the right to apply to the family court for the return of the child." *Id.* § 1024(b). As an initial matter, Sentin does not allege that her children were removed under section 1024 of the Family Court Act—or, indeed, that any emergency removal occurred. *See* Docket Item 72 ¶¶ 216-33. And she certainly does not allege that Szczepankiewicz "t[ook] or k[ept] . . . [the] child[ren] in protective custody." *See* N.Y. Fam. Ct. Act § 1024(a).

Moreover, section 1024 does not create a private right of action against a child protective services employee who fails to comply with its procedure. *See* N.Y. Fam. Ct. Act § 1024. And because "the statute [is] silent with respect to whether such failure may support a private right of action to enforce its provision," Sentin's claim under section 1024 is dismissed. *See Hedrich v. Fowler*, 2022 WL 3334201, at *8 (W.D.N.Y. June 9, 2022), *Report and Recommendation adopted by* 2022 WL 2816287 at *1 (W.D.N.Y. July 19, 2022) (dismissing without leave to amend plaintiff's cause of action for violation of a related section of the statute—N.Y. Family Court Act § 1026—where

that section was silent on whether it affords a private right of action and plaintiff could not "explain[] how he can sue the defendants directly under section 1026(c)").

### III. QUALIFIED IMMUNITY

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A right is clearly established if it "is 'sufficiently clear that every reasonable official would have understood that [his actions] violate[d] that right.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A defendant asserting qualified immunity at the pleading stage "faces a formidable hurdle" because "the plaintiff is entitled to all reasonable inferences from the facts alleged." *McKenna v. Wright*, 386 F.3d 432, 434, 436 (2d Cir. 2004); *see Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order) ("[A] defendant asserting a qualified immunity defense on a motion to dismiss faces a formidable hurdle and is usually not successful." (alteration and internal quotation marks omitted)). In fact, the court may grant a motion to dismiss based on qualified immunity only in the rare case where the "defense is based on facts appearing on the face of the complaint." *See McKenna*, 386 F.3d at 436.

Szczepankiewicz says that she is entitled to qualified immunity because she acted reasonably and used her discretion as a Child Protective Servies employee to initiate the removal proceedings based on FBI-obtained evidence. Docket Item 57-2 at 10. And the facts eventually may show that Szczepankiewicz did just that. But because the complaint alleges plausible procedural and substantive due process claims related

to the removal of the children from Sentin's custody, this is not the rare case where the complaint includes facts that give rise to qualified immunity. Szczepankiewicz's motion to dismiss the complaint on qualified immunity grounds is therefore denied.

## CONCLUSION

For the reasons stated above, Szczepankiewicz's motion to dismiss, Docket Item 73, is GRANTED IN PART and DENIED IN PART. More specifically, Szczepankiewicz's motion to dismiss Sentin's N.Y. Family Court Act § 1024 claim is granted, but her motion to dismiss Sentin's due process claims is denied. The case is referred back to Judge Foschio for further proceedings consistent with the referral order of February 1, 2024. Docket Item 27.

SO ORDERED.

Dated: September 14, 2026
Buffalo, New York

***/s/ Lawrence J. Vilardo***
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE